## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### Case No. 1:15-cv-23294-KMW

BERNARD BEBER, DIANE BEBER
JULIE LAWSON and ROBERT
LAWSON on behalf of themselves and
all others similarly situated,

       Plaintiffs,

                                 **CLASS ACTION**

v.                                   **JURY DEMAND**

BRANCH BANKING AND TRUST COMPANY,
*et al.*,

       Defendants.

_____/

### AMENDED CLASS ACTION COMPLAINT

      Plaintiffs BERNARD and DIANE BEBER and ROBERT and JULIE LAWSON file this

class action complaint on behalf of themselves and all others similarly situated against Branch

Banking and Trust Company ("BB&T"), AMERICAN SECURITY INSURANCE COMPANY

("American Security" or "Assurant"), STANDARD GUARANTY INSURANCE COMPANY

("Standard Guaranty" or "SGIC"), and VOYAGER INDEMNITY INSURANCE COMPANY

("Voyager") (Assurant, SGIC, and Voyager collectively called "Assurant" and together with

BB&T, "Defendants").

### INTRODUCTION

      1.      BB&T is one of the largest financial services holding companies in the U.S. with

approximately $210 billion in assets and market capitalization of approximately $31.3 billion, as

of August 17, 2015. Based in Winston-Salem, N.C., the company operates 2,149 financial

centers in 15 states and Washington, D.C., and offers a full range of consumer and commercial

banking, securities brokerage, asset management, mortgage and insurance products and services.

2.      BB&T worked with Assurant, and other insurance providers, to charge for force-placed insurance ("FPI") coverage on thousands of borrowers across the country during the proposed class period.  In exchange for providing them with the exclusive right to monitor the entire BB&T loan portfolio and force-place their own insurance coverage, Assurant and other insurance providers provided BB&T with kickbacks disguised as "expense reimbursements," "commissions" as well as below cost mortgage servicing functions and reinsurance, all in violation of state and federal law.  These exclusive and collusive relationships  resulted in exceptional profits for the Defendants totaling millions of dollars to both BB&T and Assurant. While most of these practices have ceased as a result of the various class action lawsuits brought before this Court and various state and federal investigations, this class action has been brought to: (1) adequately compensate the BB&T homeowners for their monetary loss, and (2) obtain a court order to enjoin such practices in the future.

3.      Lenders and servicers, like BB&T here, force place insurance when a borrower fails to obtain or maintain proper hazard, flood, or wind insurance coverage on property that secures a loan.  Under the typical mortgage agreement, if the insurance policy lapses or provides insufficient coverage, the lender has the right to "force place" a new policy on the property and then charge the premiums to the borrower.  The Defendants' force-placed insurance scheme takes advantage of the broad discretion afforded the lenders and/or servicers in standard form mortgage agreements.

4.      The money to finance the force-placed insurance schemes comes from unsuspecting borrowers who are charged inflated amounts for the force-placed insurance by lenders or servicers – BB&T here.  Borrowers are required to pay the full "premium" that the

1021690

lender or servicer initially pays to the insurer – including Assurant here – despite the fact that a considerable portion of that premium is kicked back to the lender or servicer in the manner described above.  The mortgage lender effectively gets the benefit of a rebate from the insurer that it does not pass on to the borrower and then charges the borrower the full amount, purportedly for the cost of insurance coverage.  Lenders, servicers, and force-placed insurers reap these unconscionable profits entirely at the expense of the unsuspecting borrower.

5.      Indeed, in 2012, law enforcement officials issued subpoenas to BB&T Insurance Agency Services (an affiliate of BB&T) as part of an investigation into the sale of force-placed insurance.

6.      At a recent hearing on force-placed insurance held by the National Association of Insurance Commissioners ("NAIC"), Birny Birnbaum, the foremost expert on the force-placed insurance market, illustrated the staggering growth in profits that Defendants' schemes have reaped in recent years:[1]

### LPI Premiums Have Quadrupled Since 2004

| Year | Gross Written Premium ($ Millions) | Net Written Premium ($ Millions) |
|---|---|---|
| 2004 | $1,485 | $796 |
| 2005 | $1,832 | $919 |
| 2006 | $2,163 | $1,074 |
| 2007 | $3,058 | $1,647 |
| 2008 | $4,000 | $2,209 |
| 2009 | $5,181 | $3,049 |
| 2010 | $5,915 | $3,223 |
| 2011 | $5,692 | $3,450 |
| 2004–2011 | $29,326 | $16,368 |

2009-2011 GWP Understated, Reporting Errors by QBE

CEJ LPI Presentation to NAIC                                    13                                    August 9, 2012

7.      Assurant, Inc. the parent company of ASIC, SGIC, and Voyager, is one of the two

---

[1] This graph and the ones that follow were taken from Mr. Birnbaum's presentation to the NAIC on August 9, 2012.  The presentation is available at: http://www.naic.org/documents/committees_c_120809_public_shearing_lender_placed_insurance_presentation_birnbaum.pdf.

1021690

major insurance companies that control virtually the entire market for force-placed insurance. As shown below, Assurant, Inc. held 58.6% of the nationwide market share for force-placed insurance in 2011.  Together, Assurant, Inc. and QBE/Balboa, the other major insurer with a significant market share, controlled 99.7% of the market in the same year, and held no less than 96.1% of the market between 2004 and 2011.  Large mortgage lenders and servicers sustain the insurers' monopoly by agreeing to purchase all force-placed insurance from the two insurers in exchange for kickbacks and other benefits.

### Assurant and QBE Are the Market for LPI: Countrywide Market Share

| Year | Assurant | QBE/Balboa | Assurant + QBE/Balboa |
|------|----------|------------|------------------------|
| 2004 | 68.2% | 29.8% | 98.0% |
| 2005 | 69.7% | 26.4% | 96.1% |
| 2006 | 79.2% | 19.5% | 98.7% |
| 2007 | 74.0% | 25.4% | 99.4% |
| 2008 | 74.2% | 25.5% | 99.7% |
| 2009 | 57.2% | 42.4% | 99.7% |
| 2010 | 56.2% | 43.5% | 99.7% |
| 2011 | 58.6% | 41.1% | 99.7% |

CEJ LPI Presentation to NAIC                          18                          August 9, 2012

8.     It is no surprise that these Defendants' practices have come under increased scrutiny in recent years by the government and regulators.  For example:[2]

- On March 21, 2013, the New York Department of Financial Services'

---

[2] The Defendants' practices have also come under increased scrutiny by the courts.  This Court has already certified a Florida class against Wells Fargo Bank, N.A. and Wells Fargo Insurance, Inc. (as well as their exclusive force-placed insurance carrier, QBE) – on many of the same practices described here. *See Williams v. Wells Fargo Bank, N.A.*, No. 11-cv-21233, 280 F.R.D. 665 (S.D. Fla. 2012).

1021690

("NYDFS"), investigation into force-placed insurance practices "produced a major settlement with the country's largest 'force-placed' insurer, Assurant, Inc. . . . [The settlement] includes restitution for homeowners who were harmed, a $14 million penalty paid to the State of New York, and industry-leading reforms that will save homeowners, taxpayers, and investors millions of dollars going forward through lower rates."[3] Further, under the Consent Order entered, Assurant and its subsidiaries (including Assurant and SGIC), are prohibited from paying commissions to any servicers or entity affiliated with a servicer on force-placed insurance policies obtained by the servicer.   *See* Assurant & NYDFS Consent Order, Mar. 21, 2013, at 9.

- At NYDFS hearings on May 17, 2012 related to the force-placed insurance market, the Superintendent of Financial Services, Benjamin Lawsky, stated that the Department's initial inquiry uncovered "serious concerns and red flags" which included: 1) exponentially higher premiums, 2) extraordinarily low loss ratios, 3) lack of competition in the market, and 4) tight relationships between the banks, their subsidiaries, and insurers.  She went on to state:

  > In sum when you combine [the] close and intricate web of relationships between the banks and insurance companies on the one hand, with high premiums, low loss ratios, and lack of competition on the other hand, it raises serious questions . . . .

- After the August 2012 NAIC hearings, the state regulator from Louisiana, James Donelon, referred to the force-placed insurance market as a "monopoly" and stated that stricter regulations may be needed.[4]

- On December 18, 2013, Fannie Mae issued its Servicing Guide Announcement related to force-placed insurance that, among other things, prohibits servicers from including any commissions, bonuses, or other incentive compensation in the amounts charged to borrowers for force-placed insurance and further requires that the force-placed insurance carrier cannot be an affiliated entity of the servicer.[5]

---

[3] *See Cuomo Administration Settles with Country's Largest Force-Placed Insurer, Leading Nationwide Reform Effort and Saving Homeowners, Taxpayers, and Investors Millions of Dollars*, Dep't of Fin. Servs., Mar. 21, 2013, *available at,* http://www.dfs.ny.gov/about/press2013/pr1303211.htm.

[4] *See* Z. Tracer & D. Beasley, *U.S. Regulators to Examine Forced-Place Insurance*. Bloomberg Businessweek, Aug. 10, 2012, *available at,* http://www.bloomberg.com/news/2012-08-10/u-s-regulators-to-examine-forced-place-insurance.html.

[5] *See* https://www.fanniemae.com/content/announcement/svc1327.pdf

9.       Florida has been at the epicenter of all force-placed insurance activity nationwide—more than one-third of all force-placed premiums are placed in Florida, three times more than in California, which has the second-highest volume. Assurant Specialty Property, the division through which Assurant operates their force-placed insurance business, is located in Miami, Florida and the Assurant actuarial department that sets the rates for all force-placed insurance nationwide is also located here in Miami, Florida.

10.      In his presentation to the NAIC, Mr. Birnbaum illustrated the astounding rise in force-placed insurance policies in Florida:

**LPI Premium by State:  Florida Has Become Ground Zero**

|     | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 |
|-----|------|------|------|------|------|------|------|------|
| FL  | 10.6% | 10.8% | 13.3% | 17.9% | 22.9% | 34.3% | 36.7% | 35.1% |
| CA  | 20.8% | 19.3% | 21.2% | 23.5% | 24.3% | 14.0% | 11.1% | 10.2% |
| TX  | 10.6% | 10.7% | 8.8% | 8.7% | 7.0% | 5.6% | 5.6% | 6.1% |
| NY  | 3.6% | 3.6% | 4.5% | 4.4% | 4.3% | 4.7% | 5.4% | 5.6% |
| IL  | 3.0% | 3.3% | 3.9% | 3.7% | 3.9% | 4.4% | 4.1% | 4.6% |
| NJ  | 2.9% | 2.7% | 2.9% | 2.7% | 2.7% | 2.9% | 3.4% | 4.0% |
| MI  | 4.2% | 4.4% | 4.4% | 5.8% | 3.6% | 2.7% | 2.2% | 2.0% |
| OH  | 3.6% | 3.8% | 3.5% | 2.7% | 2.4% | 2.2% | 2.3% | 2.9% |
| GA  | 3.4% | 3.2% | 3.2% | 2.4% | 2.3% | 2.3% | 2.3% | 2.3% |
| PA  | 2.6% | 2.6% | 2.7% | 1.8% | 1.8% | 1.8% | 1.7% | 1.8% |

CEJ LPI Presentation to NAIC                          15                          August 9, 2012

11.      Defendants' self-dealing and collusion in the force-placed insurance market has caused substantial harm to the named Plaintiffs and the proposed class they seek to represent. This class action seeks to redress that harm on behalf of the Plaintiffs and the class of consumers and to recover all improper costs they have incurred related to the forced placement of insurance by BB&T and Assurant.

1021690

## PARTIES

**Plaintiffs**

12.     Plaintiffs BERNARD and DIANE BEBER are citizens of the State of Florida. They are natural persons over the age of 21 and otherwise *sui juris*.

13.     Plaintiffs JULIE and ROBERT LAWSON are citizens of the State of Virginia. They are natural persons over the age of 21 and otherwise *sui juris*.

**Defendants**

14.     Defendant AMERICAN SECURITY INSURANCE COMPANY is a Delaware corporation and an indirect subsidiary of Assurant Inc., writing force-placed insurance policies in all fifty states and the District of Columbia with its principal address in Atlanta, Georgia. American Security often operates under the trade name "Assurant Specialty Property." American Security contracts with the lenders to act as a force-placed insurance vendor.  Its duties include, but are not limited to, tracking loans in their mortgage portfolio, handling all customer service duties related to force-placed insurance, and securing force-placed insurance policies on properties when a borrower's insurance has lapsed.

15.      Defendant STANDARD GUARANTY INSURANCE COMPANY is a Delaware corporation and an indirect subsidiary of Assurant, writing force-placed insurance policies in all fifty states and the District of Columbia with its principal address in Georgia.  SGIC also often operates under the trade name "Assurant Specialty Property."  SGIC, like ASIC, contracts with mortgage lenders and servicers to act as a force-placed insurance vendor.  Its duties include, but are not limited to, tracking loans in their mortgage portfolio, handling all customer service duties related to force-placed insurance, and securing force-placed insurance policies on properties when a borrower's insurance has lapsed.

1021690

16.     Defendant VOYAGER INDEMNITY INSURANCE COMPANY is a Georgia Corporation and an indirect subsidiary of Assurant, Inc., writing force-placed insurance policies in many states with its principal address in Atlanta, Georgia.

17.     Defendant BB&T is a mortgage lender and servicer headquartered in Winston-Salem, North Carolina.  BB&T conducts business throughout the United States, including this District.  Upon information and belief, BB&T services mortgage loans through its division BB&T Home Mortgage.

## JURISDICTION AND VENUE

18.     This Court has jurisdiction over this action pursuant to the Class Action Fairness Act of 2005 ("CAFA"), Pub. L. No. 109-2, 119 Stat. 4 (codified in various sections of 28 U.S.C.).

19.     Plaintiffs are citizens of the States of Florida and Virginia.  Defendants are citizens of various other states but are registered to do business in the aforementioned states. The amount in controversy exceeds $5,000,000 and there are at least one hundred members of the putative class.

20.     This Court has jurisdiction over Defendants because they are foreign corporations authorized to conduct business in Florida, are doing business in Florida and have registered with the Florida Secretary of State, or do sufficient business in Florida, have sufficient minimum contacts with Florida, or otherwise intentionally avail themselves of the Florida consumer market through the promotion, marketing, sale, and service of mortgages or other lending services and insurance policies in Florida.  This purposeful availment renders the exercise of jurisdiction by this Court over Defendants and their affiliated or related entities permissible under traditional notions of fair play and substantial justice.

21.     In addition, this Court has subject-matter jurisdiction under CAFA because the

8

amount in controversy exceeds $5 million and diversity exists between Plaintiffs and the Defendants.  28 U.S.C. § 1332(d)(2).  Further, in determining whether the $5 million amount in controversy requirement of 28 U.S.C. § 1332(d)(2) is met, the claims of the putative class members are aggregated.  28 U.S.C. § 1332(d)(6).

22.     Venue is proper in this forum pursuant to 28 U.S.C. § 1391 Defendants transact business and may be found in this District.  Venue is also proper here because at all times relevant hereto, Plaintiffs resided in the Southern District of Florida and a substantial portion of the practices complained of herein occurred in the Southern District of Florida

23.     All conditions precedent to this action have occurred, been performed, or have been waived.

## FACTUAL ALLEGATIONS

24.     Permitting a lender to forcibly place insurance on a mortgaged property and charge the borrower for the cost of the premium is neither a new concept nor a term undisclosed to borrowers in mortgage agreements.  The standard form mortgage agreements owned or serviced by BB&T include a provision requiring the borrower to maintain hazard insurance coverage, flood insurance coverage if the property is located in a Special Flood Hazard Area as determined by the Federal Emergency Management Agency, and wind insurance on the property securing the loan, and in the event the insurance lapses, permit the lender to obtain force-placed coverage and charge the premiums to the borrower rather than declare the borrow in default.

25.     What is unknown to borrowers and not disclosed in the mortgage agreements is that BB&T has exclusive arrangements with Assurant, to manipulate the force-placed insurance market and artificially inflate the amounts they charge to borrowers for FPI "premiums."  The charges are inflated to provide BB&T and its affiliates with kickbacks in the form of

9

"commissions," "qualified expense reimbursements," or reinsurance arrangements, and to cover the cost of discounted services, and other unmerited charges.  The borrower is then forced to pay these inflated amounts.

**The Force-Placed Insurance Scheme**

26.     Assurant has exclusive arrangements with BB&T to monitor its mortgage portfolio and provide force-placed insurance.  In addition to the subsidized mortgage services they receive from the Assurant, a percentage of borrowers' FPI charges are "kicked back" and paid directly to BB&T.

27.      The scheme works as follows.  BB&T purchases master insurance policies that cover its entire portfolio of mortgage loans.  In exchange, Assurant is given the exclusive right to force insurance on property securing a loan within the portfolio when the borrower's insurance lapses or the lender determines the borrower's existing insurance is inadequate.  Assurant monitors BB&T's entire loan portfolio for lapses in borrowers' insurance coverage.  Once a lapse is identified, Assurant an automated cycle of notices purporting to come from BB&T is sent to the borrowers to inform them that insurance will be "purchased" and force-placed if the voluntary coverage is not continued.  If a lapse continues, the borrower is notified that insurance is being force-placed at his or her expense.

28.     No individualized underwriting ever takes place for the force-placed coverage. Insurance is automatically placed on the property and the inflated amounts are charged to the borrower.  In many instances, the insurance lapse is not discovered for months or even years after the fact.  Despite the absence of any claim or damage to the property during the period of lapse, retroactive coverage is placed on the property and the borrower is charged for the "cost" of the past premiums.

10

29.     Once coverage is forced on the property, BB&T pays the insurer for the premium and then charges the borrower for the payment, which is either deducted from the borrower's mortgage escrow account or added to the balance of the borrower's loan.[6]  The borrower's escrow account is depleted irrespective of whether other escrow charges, such as property taxes, are also due and owing.

30.     Once BB&T has paid Assurant the full amount invoiced, Assurant kicks back a set percentage of that amount to BB&T or its affiliates as "commissions" or "expense reimbursements."  Upon information and belief, any BB&T affiliate that receives this kickback passes along that payment to BB&T, sometimes in the form of "soft dollar" credits.

31.     These "commissions" or "expense reimbursements" are not legitimate reimbursements for actual costs nor are they commissions that have been earned for any work done by BB&T or an affiliate related to the placement of the insurance: They are simply kickbacks to BB&T for the exclusive arrangement to force-place insurance.

32.     The money paid back to BB&T and its affiliates is not given in exchange for any services provided by them; it is simply grease paid to keep the force-placed machine moving.  In an attempt to mask the kickbacks as legitimate, Assurant will often disclose to the borrower that BB&T or its affiliates may earn commissions or compensation as a result of the forced placement of new coverage.  In reality, however, no work is ever done by BB&T or its affiliates to procure insurance for that particular borrower because the coverage comes through the master policy already in place.  As a result, no commission or compensation is "earned" and, in addition, neither BB&T nor its affiliates incur any costs in relation to force-placing insurance on any particular borrower and therefore no "expense reimbursement" is due.

---

[6] On some occasions, when a borrower does not have an escrow account, an escrow account with a negative balance is created and the borrower is charged to bring the balance to zero.

1021690

33.     Under this highly profitable force-placed insurance scheme, BB&T is incentivized to purchase and force place insurance policies with artificially inflated premiums on a borrowers' properties because the higher the cost of the insurance policy, the higher the kickback.  And, as a result of the kickbacks, BB&T effectively pays a reduced amount for force-placed insurance coverage but does not to pass these savings on to its borrowers

34.     Assurant and BB&T also enter into agreements for Assurant to provide servicing activities on BB&T's entire loan portfolio at below cost.  These activities include but are not limited to services such as new loan boarding, escrow administration, and loss draft functions – many of which have little or nothing to do with force-placed insurance.  Assurant takes on these mortgage servicing functions – which are BB&T's responsibility pursuant to its agreements with the owners of the loans – to maintain its exclusive right to force-place insurance on BB&T borrowers.

35.     The full servicing costs are added into the force-placed amounts which are then passed on to the borrower.  The insurers are able to provide these services at below cost because of the enormous profits they make from the hyper-inflated premiums charged for force-placed insurance.  However, because insurance-lapsed mortgaged property comprises only 1-2% of the lenders' total mortgage portfolio, the borrowers who pay the charges from the lenders unfairly bear the entire cost to service the entire loan portfolio – despite many of the services having nothing to do with FPI. These charges, passed on to Plaintiffs and the proposed class, are not properly chargeable to the borrower because they are expenses associated with the servicing of all the loans and the loan servicers are already compensated for these activities by the owners of the loans (i.e. Fannie Mae).

36.     The small percentage of borrowers who are charged for force-placed insurance

shoulder the costs of monitoring BB&T's entire loan portfolio, effectively resulting in a kickback.

37.     In addition, upon information and belief, the Assurant enter into essentially riskless "captive reinsurance arrangements" with BB&T's affiliates to "reinsure" the property insurance force-placed on borrowers.   A recent *American Banker* article illustrated this reinsurance problem using JPMorgan Chase's program by way of example:

> JPMorgan and other mortgage servicers reinsure the property insurance they buy on behalf of mortgage borrowers who have stopped paying for their own coverage. In JPMorgan's case, 75% of the total force-placed premiums cycle back to the bank through a reinsurance affiliate. This has raised further questions about the force-placed market's arrangements. . . .

> Over the last five years, Chase has received $660 million in reinsurance payments and commissions on force-placed policies, according to New York's DFS. . . .

> Of every hundred dollars in premiums that JPMorgan Chase borrowers pay to Assurant, the bank ends up keeping $58 in profit, DFS staff asserted. The agency suggested the bank's stake in force-placed insurance may encourage it to accept unjustifiably high prices by Assurant and to avoid filing claims on behalf of borrowers, since that would lower its reinsurer's returns.

> The DFS staff also questioned the lack of competition in the industry, noting that Assurant and QBE have undertaken acquisitions that give them long-term control of 90% of the market.  Further limiting competition are the companies' tendency to file identical rates in many states, Lawsky and his staff argue.

J. Horwitz, *Chase Reinsurance Deals Draw New York Regulator's Attacks*, AM. BANKER, May 18, 2012, *available at* http://www.americanbanker.com/issues/177_97/chase-reinsurance-deals-regulator-attack-1049460-1.html.

38.     BB&T's reinsurance program, like those of other lenders, is simply a way to funnel profits, in the form of ceded premiums, to BB&T at borrowers' expense.   While reinsurance can, and often does, serve a legitimate purpose, here it does not.  On information and

13

belief, BB&T or its affiliates enter into reinsurance agreements with Assurant that provide that the insurer will return to BB&T significant percentages of the FPI charges by way of ceded reinsurance premiums to BB&T affiliates or subsidiaries – which in turn pass on these profits to BB&T.  The ceded premiums are nothing more than a kickback to BB&T and a method for Defendants to profit from the forced placement of new coverage.  Indeed, while BB&T or its affiliates purportedly provided reinsurance, they did not assume any real risk.

39.     BB&T also overcharges borrowers by disregarding the Standard Mortgage Clause or the Lender's Loss Payable Endorsement ("LLPE") in the standard form mortgage agreement. Either of these clauses typically protects the lender for a period of at least ten days after the termination of the homeowner's voluntary insurance policy.  Force-placed policies, however, take effect on the date of termination, and "double-cover" the property unnecessarily during the period covered by the LLPE or Standard Mortgage Clause.  This means the borrower is charged for coverage for which the lender or servicer has no exposure.

40.      The amounts charged borrowers are also inflated by the interest that accrues on the amounts owed for force-placed coverage; when BB&T adds the charge for the FPI to a homeowner's mortgage balance, it thereby increases the interest paid over the life of the loan by the homeowner to the lender.

41.     At various points in time, BB&T had similar arrangements with other force-placed insurance providers.

42.     The actions and practices described above are unconscionable and undertaken in bad faith with the sole objective to maximize profits.  Borrowers who for whatever reason have stopped paying for insurance or are under-insured on mortgaged property are charged hyper-inflated and illegitimate noncompetitive amounts for force-placed insurance.  These charges are

inflated to include undisclosed kickbacks to the Defendants or their affiliates (who, as described above, perform little to no functions related to the force-placement of the individual policies), as well as the cost of captive reinsurance arrangements, and discounted administrative services.

43.     Borrowers have no say in the selection of the force-placed insurance carrier or the terms of the force-placed insurance policies.  Force-placed policies are commercial insurance policies and their terms are determined by the lender or servicer - BB&T, and the insurer - Assurant.

44.     Plaintiffs here do not challenge BB&T's right to force place insurance in the first instance.  They challenge Defendants' manipulation of the force-placed insurance market with an eye toward artificially inflating premiums and placing unnecessary coverage, which BB&T purchases from the Assurant and other insurance providers and then chooses to pass on to the borrower. Lenders or servicers, like BB&T, are financially motivated to utilize the insurer, like the Assurant, that offers it the best financial benefit in the terms of "commissions," "expense reimbursements," discounted tracking services, or ceded reinsurance premiums.  This action is brought to put an end to Defendants' exclusive, collusive, and uncompetitive arrangements, and to recover for Plaintiffs the excess amounts charged to her beyond the true cost of insurance coverage.

### Plaintiffs – Diane Beber and Bernard Beber

45. The Beber Plaintiffs own a home in Miami, Florida.

46. In December 2012, the Beber Plaintiffs refinanced their mortgage with BB&T.

47. Paragraph 5 of the Beber mortgage contract states in pertinent part as follows:

> 5.      That [Plaintiffs] will continuously maintain fire, flood and such other hazard insurance as the Mortgagee may require on the improvements which form a part of the Property, now or hereafter constructed on the Property, and will pay promptly when due any premiums on the insurance.

1021690

> If it is determined at any time that any of the Property is located in a flood hazard area as defined in the Flood Disaster Protection Acts of 1973, the Mortgagor shall obtain and maintain flood insurance on Property at Mortgagor's expense for as long as this Mortgage is in effect. [] If the Mortgagor shall fail to procure or maintain hazard or flood insurance coverage in the specified amount for the Property within a reasonable time of receiving notice from Mortgagee of either the requirement or of the lapse of an existing policy, Mortgagee may, but shall not be obligated to, expend for the account of Mortgagor any sums which may be necessary to purchase the required hazard or flood insurance, which shall be fully secured by this Mortgage and which shall accrue interest from the time expended until paid at the rate set forth in the Note(s). Mortgagor shall cause all policies and renewals thereof to be delivered to the Mortgagee. All insurance shall be carried with companies approved by Mortgagee and shall contain a loss payable clause (New York long form) in favor of and in a form acceptable to Mortgagee.…

48.     In or about March of 2013, the Beber Plaintiffs voluntary insurance lapsed. BB&T then purchased an FPI policy through Assurant and force-placed it on the Plaintiffs' property.   Before 2013, BB&T purchased FPI from other insurance providers for the Beber Plaintiff's property.

49.     The Beber Plaintiffs were charged for and paid amounts for force-placed coverage in connection with the FPI policy.

50.     The Defendants never disclosed to the Beber Plaintiffs that the "cost" of the insurance that they were force-placing on them included unearned kickbacks to BB&T as well as the cost of servicing BB&T's entire mortgage portfolio.   The amounts kicked back to BB&T were not reduced from the amount charged resulting in the Beber Plaintiffs paying more than the "cost" of the insurance.

51.     There are no material differences between these Defendants' actions and practices directed to Mr. and Mrs. Beber and their actions and practices directed to the Class.

16

**Plaintiffs Julie and Robert Lawson**

52.     The Lawson Plaintiffs own a home in Covington, VA. At all relevant times their home was owned or serviced by BB&T.

53.     The Lawson Plaintiffs' mortgage contract contain materially similar terms regarding the purchase and placement of insurance as to the Beber Plaintiffs' and other Class members' contracts.

54.     In or about September 2014, the Lawson Plaintiffs flood insurance lapsed and BB&T purchased a force-placed flood policy through Assurant.  The flood FPI was renewed in 2015.

55.     The Lawson Plaintiffs were charged for and paid amounts for force-placed coverage in connection with the FPI policies.

56.     The Defendants never disclosed to the Lawson Plaintiffs that the "cost" of the insurance that they were force-placing on them included unearned kickbacks to BB&T as well as the cost of servicing BB&T's entire mortgage portfolio.  The amounts kicked back to BB&T were not reduced from the amount charged resulting in the Lawson Plaintiffs paying more than the "cost" of the insurance.

57.     There are no material differences between these Defendants' actions and practices directed to Mr. and Mrs. Lawson and their actions and practices directed to the Class.

**CLASS ALLEGATIONS**

A.     **Class Definition**

58.     Plaintiffs bring this action against Defendants pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and all other persons similarly situated. Plaintiffs seek to represent the following classes:

1021690

Nationwide class:

> All borrowers in the United States who, from January 1, 2010 to the present, were charged by BB&T under a hazard, flood, flood gap or wind-only LPI Policy for Residential Property, and who, within the Class Period, either (i) paid to BB&T the Net Premium for that LPI Policy or (ii) did not pay to and still owe BB&T the Net Premium for that LPI Policy.  Excluded from the Class are:  (i) individuals who are or were during the Class Period officers or directors of the Defendants or any of their respective affiliates; (ii) any justice, judge, or magistrate judge of the United States or any State, their spouses, and persons within the third degree of relationship to either of them, or the spouses of such persons; (iii) borrowers who only had an LPI Policy that was cancelled in its entirety such that any premiums charged and/or collected were fully refunded to the borrower or the borrower's escrow account; and, (iv) all borrowers who file a timely
> and proper request to be excluded from the Class.

59.     Plaintiffs reserve the right to modify or amend the definitions of the proposed class before the Court determines whether certification is appropriate.

60.     Defendants subjected Plaintiffs and the respective Class members to the same unfair, unlawful, and deceptive practices and harmed them in the same manner.

**B.     Numerosity**

61.     The proposed classes are so numerous that joinder of all members would be impracticable.  Defendants sell and service millions of mortgage loans and insurance policies in Florida, Virginia as well as nationwide.  The individual class members are ascertainable, as the names and addresses of all class members can be identified in the business records maintained by Defendants.   The precise number of class members for the class numbers at least in the thousands and can only be obtained through discovery, but the numbers are clearly more than can be consolidated in one complaint such that it would be impractical for each member to bring suit individually.  Plaintiffs do not anticipate any difficulties in the management of the action as a class action.

C.     <u>**Commonality**</u>

62.     There are questions of law and fact that are common to Plaintiffs' and Class members' claims.  These common questions predominate over any questions that go particularly to any individual member of the Class.  Among such common questions of law and fact are the following:

a.   Whether Defendants charged borrowers for unnecessary insurance coverage including, but not limited to, insurance coverage that exceeded the amount required by law or the borrowers' mortgages and/or backdated coverage that covered periods of time for which Defendants had no risk of loss;

b.   Whether BB&T breached the mortgage contracts with Plaintiffs and the Class by charging them for force-placed insurance that included illegal kickbacks (including unwarranted commissions or qualified expense reimbursements, and reinsurance payments) and by charging Plaintiffs and the Class for servicing their loans;

c.   Whether Defendants have been unjustly enriched at the expense of the Plaintiffs and the Class;

d.   Whether BB&T breached the implied covenant of good faith and fair dealing by entering into exclusive arrangements with Assurant which resulted in inflated amounts for the FPI coverage being charged to Plaintiffs and the Class;

e.   Whether Defendants manipulated forced-placed insurance purchases in order to maximize their profits to the detriment of Plaintiffs and the Class;

f.   Whether BB&T or its affiliates perform any work or services in exchange for the "commissions" or other "compensation" they collect;

g.   Whether the "qualified expense reimbursements" received by BB&T are for true expenses or are just kickback pursuant to their exclusive relationship with the Assurant;

h.   Whether BB&T's charges to Plaintiffs and the Class are inflated to include kickbacks and unwarranted "commissions" or "expense reimbursements;"

i.   Whether BB&T's charges are inflated to include amounts for bundled administrative services or below-cost servicing activities that the vendors provide to the lenders or mortgage servicers, and which are not chargeable to Plaintiffs and the Class under the terms of their mortgages;

19

j.   Whether the charges are inflated to include the cost of a captive reinsurance arrangement;

k.   Whether BB&T violated the federal Truth in Lending Act ("TILA") by conditioning their extensions of credit on the purchase of insurance through an affiliate, in direct contravention of the anti-coercion disclosures included in borrowers' mortgages;

l.   Whether BB&T violated TILA by failing to disclose kickbacks charged to class members in their mortgages;

m.   Whether the Assurant intentionally and unjustifiably interfered with Plaintiffs' and the Class's rights under the mortgage contracts by paying kickbacks to the lenders/mortgage servicers or their affiliates and by charging for administering the loan portfolio; and

n.   Whether Plaintiffs and the Class Members are entitled to damages and/or injunctive relief as a result of Defendants' conduct.

**D.**   **Typicality**

63.   Plaintiffs are members of the Class they seeks to represent.  Plaintiffs' claims are typical of the Class's claims because of the similarity, uniformity, and common purpose of the Defendants' unlawful conduct.  Each Class member has sustained, and will continue to sustain, damages in the same manner as Plaintiffs as a result of Defendants' wrongful conduct.

**E.**   **Adequacy of Representation**

64.   Plaintiffs are adequate representatives of the class they seek to represent and will fairly and adequately protect the interests of that class.  Plaintiffs are committed to the vigorous prosecution of this action and have retained competent counsel, experienced in litigation of this nature, to represent them.  There is no hostility between Plaintiffs and the unnamed Class members.  Plaintiffs anticipates no difficulty in the management of this litigation as a class action.

1021690

65.    To prosecute this case, Plaintiffs have chosen the undersigned law firms, which are very experienced in class action litigation and have the financial and legal resources to meet the substantial costs and legal issues associated with this type of litigation.

**F.    Requirements of Fed. R. Civ. P. 23(b)(3)**

66.    The questions of law or fact common to Plaintiffs' and each Class member's claims predominate over any questions of law or fact affecting only individual members of the class.  All claims by Plaintiffs and the unnamed Class members are based on the force-placed insurance policies that Defendants unlawfully secured and their deceptive and egregious actions involved in securing the force-placed policy.

67.    Common issues predominate when, as here, liability can be determined on a class-wide basis, even when there will be some individualized damages determinations.

68.    As a result, when determining whether common questions predominate, courts focus on the liability issue, and if the liability issue is common to the class as is the case at bar, common questions will be held to predominate over individual questions.

**G.    Superiority**

69.    A class action is superior to individual actions in part because of the non-exhaustive factors listed below:

> (a) Joinder of all class members would create extreme hardship and inconvenience for the affected customers as they reside all across the states;
>
> (b) Individual claims by class members are impractical because the costs to pursue individual claims exceed the value of what any one class member has at stake.  As a result, individual class members have no interest in prosecuting and controlling separate actions;
>
> (c) There are no known individual class members who are interested in individually controlling the prosecution of separate actions;

(d) The interests of justice will be well served by resolving the common disputes of potential class members in one forum;

(e) Individual suits would not be cost effective or economically maintainable as individual actions; and

(f) The action is manageable as a class action.

**H.**     **Requirements of Fed. R. Civ. P. 23(b)(1) & (2)**

70.     Prosecuting separate actions by or against individual Class members would create a risk of inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class.

71.     Defendants have acted or failed to act in a manner generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole.

## COUNT I

## BREACH OF CONTRACT
### (against BB&T)

72.     Plaintiffs re-allege and incorporate paragraphs 1 – 57, above as if fully set forth herein and further allege as follows.

73.     Plaintiffs and all similarly situated Class members have mortgages that are owned and/or serviced by BB&T.

74.     Plaintiffs and these Class members' mortgages are written on uniform mortgage forms and contain substantially similar provisions regarding FPI requirements and its placement by BB&T.

75.     Plaintiffs' mortgages require that they maintain insurance on her property and provide that if they fail to do so, then the lender may obtain insurance coverage to protect its

interest in the property, "force place" the coverage, and charge the borrower the cost.

76.    BB&T charges borrowers amounts for force-placed insurance that include unmerited "qualified expense reimbursements" or "commissions," reinsurance premiums, as well as discounted administrative, servicing, and other impermissible costs.  These costs are not costs of coverage, and are not applied to protecting BB&T's rights or risk in the collateral for borrowers' mortgage loans.  BB&T breached the mortgage agreements by, among other things, charging Plaintiffs and Class members the amounts beyond the actual cost of coverage.

77.    BB&T has also breached Plaintiffs' and the class members' mortgage agreements by charging Plaintiffs and the Class for excess and unnecessary force-placed insurance coverage, including retroactive coverage, as such coverage does not protect BB&T's rights in their collateral or cover their risk.

78.    Plaintiffs and the Class members have suffered damages as a result of the BB&T' breaches of contract.

**WHEREFORE**, Plaintiffs, on behalf of themselves and all similarly situated class members, seek compensatory damages resulting from the BB&T's breach of contract, as well as injunctive relief preventing them from further violating the terms of the Class members' mortgages.  Plaintiffs further seek all relief deemed appropriate by this Court, including attorneys' fees and costs.

## COUNT II

## BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING
### (against BB&T)

79.    Plaintiffs re-allege and incorporate paragraphs 1 – 57, above as if fully set forth herein and further allege as follows.

80.    A covenant of good faith and fair dealing is implied in every contract and imposes

23

1021690

upon each party a duty of good faith and fair dealing in its performance.  Common law calls for substantial compliance with the spirit, not just the letter, of a contract in its performance.

81.     Where an agreement affords one party the power to make a discretionary decision without defined standards, the duty to act in good faith limits that party's ability to act capriciously to contravene the reasonable contractual expectations of the other party.

82.     Plaintiffs' and the Class members' mortgage contracts allow BB&T to force place insurance coverage on the borrower in the event of a lapse in coverage, but do not define standards for selecting an insurer or procuring an insurance policy.

83.     BB&T is afforded substantial discretion in force-placing insurance coverage.  It is permitted to unilaterally choose the company from which it purchases FPI and negotiates any price for the coverage it procures.  BB&T has an obligation to exercise the discretion afforded it in good faith, and not capriciously or in bad faith.  Plaintiffs does not seek to vary the express terms of the mortgage contract, but only to insure that BB&T exercises its discretion in good faith.

84.     BB&T breached the implied covenant of good faith and fair dealing by, among other things:

>       (a) Manipulating the force-placed insurance market by selecting insurers that will artificially inflate premiums to include kickbacks to BB&T or its affiliates and issue excess insurance coverage not necessary to cover BB&T's risk, and by failing to seek competitive bids on the open market and instead contracting to create "back room" deals whereby insurance coverage is routinely purchased without seeking a competitive price;
>
>       (b)  Exercising its discretion to choose an insurance policy in bad faith and in contravention of the parties' reasonable expectations, by purposefully selecting force-placed insurance policies with artificially inflated premiums to maximize its own profits;
>
>       (c)  Assessing inflated and unnecessary insurance policy charges against Plaintiffs and the Class and misrepresenting the reason for the cost of the

24

policies;

(d)   Allowing BB&T or its affiliates to collect a percentage of the amounts charged to borrowers and not passing that percentage on to the borrower, thereby creating the incentive to seek the highest-priced premiums possible;

(e)  Charging Plaintiffs and the Class the cost of having the vendor perform its obligation of servicing its mortgage portfolio, which is not properly chargeable to Plaintiffs or the Class;

(f)   Charging Plaintiffs and the Class for expense reimbursements or commissions when the insurance is prearranged and no expenses related to the placement of the FPI are incurred and no commission is due; and

(h)  Charging Plaintiffs and the Class an inflated charge for the force-placed insurance due to the captive reinsurance arrangement.

85.     As a direct, proximate, and legal result of the aforementioned breaches of the covenant of good faith and fair dealing, Plaintiffs and the Class have suffered damages.

**WHEREFORE**, Plaintiffs, on behalf of themselves and similarly situated Class members, seek a judicial declaration that the premiums charged and the terms of the force-placed insurance policies violate the duties of good faith and fair dealing.  Plaintiffs also seek damages resulting from the BB&T's breaches of its duties.  Plaintiffs further seek all relief deemed appropriate by this Court, including attorneys' fees and costs.

## COUNT III

### UNJUST ENRICHMENT
### (against BB&T)[7]

86.     Plaintiffs re-allege and incorporate paragraphs 1 – 57, above as if fully set forth herein and further allege as follows.

87.     BB&T received from Plaintiffs and Class members, benefits in the form of unwarranted kickbacks, including reimbursements or commissions, captive reinsurance

---

[7] Plaintiffs plead their unjust enrichment claim against BB&T in the alternative to their contractual claims against them.

arrangements, and subsidized loan servicing costs.

88.     BB&T entered into an agreement whereby the insurance vendor would provide force-placed insurance policies to BB&T for the portfolio of loans monitored on behalf of BB&T.  BB&T would then charge Plaintiffs and the Class amounts for the FPI that had been artificially inflated to include the kickbacks described above and then retain the amounts of those kickbacks for itself.  The force-placed policies imposed on borrowers therefore cost less than what BB&T actually paid for them.

89.     Insurers, including Assurant, paid and collected significant monies in premiums, kickbacks, commissions, reimbursements, and reinsurance tied directly to the cost of the force-placed insurance premium (as a percentage).  Commissions or kickbacks were paid directly to BB&T or its affiliates in order to be able to exclusively provide force-placed insurance policies. The insurers were mere conduits for the delivery of the kickbacks and improper charges to BB&T or its affiliates.

90.     These payments directly benefitted BB&T and/or its affiliates and were taken to the detriment of the borrower.  The kickbacks (in the form reimbursements, commissions, or reinsurance arrangements, as well as subsidized costs) were subsumed into the price of the insurance premium and ultimately paid by the borrower.  Therefore, BB&T had the incentive to charge and collect unreasonably inflated prices for the force-placed policies.

91.     Further, BB&T was unjustly enriched through financial benefits in the form of increased interest income when the amounts for the FPI policies were added to the Class members' mortgage loans and through duplicative insurance based upon the Lender Loss Payable Endorsement or the Standard Mortgage Clause.

92.     As a result, Plaintiffs and the Class have conferred a benefit on BB&T.

26

1021690

93.     BB&T had knowledge of this benefit and voluntarily accepted and retained the benefit conferred on it.

94.     BB&T will be unjustly enriched if it is allowed to retain the aforementioned benefits, and each Class member is entitled to recover the amount by which BB&T was unjustly enriched at his or her expense.

**WHEREFORE**, Plaintiffs, on behalf of themselves and all similarly situated Class members, demand an award against BB&T in the amounts by which it has been unjustly enriched at Plaintiffs' and the Class Members' expense, and such other relief as this Court deems just and proper.

<u>**COUNT IV**</u>

<u>**UNJUST ENRICHMENT**</u>
<u>**(against Assurant)**</u>

95.     Plaintiffs re-allege and incorporate paragraphs 1 – 57, above as if fully set forth herein and further allege as follows.

96.     Assurant received from Plaintiffs and the Class members, benefits in the form of funds for insurance premiums related to force-placed insurance policies.

97.     Assurant received below-cost payments from BB&T for providing mortgage servicing functions (many not related to FPI) but included their entire cost of servicing BB&T's mortgages  in the premiums for force-placed insurance that were ultimately charged by BB&T to the borrowers.  Assurant knew that the amounts for the force-placed insurance would be ultimately charged to the borrower and passed through to it but did not reduce the charges by the amounts paid to it from BB&T for the tracking services.

98.     Assurant paid significant monies to BB&T in kickbacks (commissions, expense reimbursements, or reinsurance premiums) tied directly to the cost of the force-placed insurance

premium (as a percentage).  Commissions or kickbacks were paid directly to BB&T in order to be able to exclusively provide force-placed insurance policies and receive the corresponding insurance premiums.

99.     BB&T acted as a mere conduit for the delivery of funds to Assurant.

100.    As a result, Plaintiffs and the Class have conferred a benefit on Assurant.

101.    Assurant had knowledge of this benefit and voluntarily accepted and retained the benefit conferred on them.

102.    Assurant will be unjustly enriched if it is allowed to retain the aforementioned benefits, and each Class member is entitled to recover the amount by which this Defendant was unjustly enriched at his or her expense.

**WHEREFORE**, Plaintiffs, on behalf of themselves and all similarly situated Class members, demand an award against Assurant in the amounts by which it has been unjustly enriched at Plaintiffs' and the Class Members' expense, and such other relief as this Court deems just and proper.

## COUNT V

## TORTIOUS INTERFERENCE WITH A BUSINESS RELATIONSHIP
### (against Assurant)

103.    Plaintiffs re-allege and incorporate paragraphs 1 – 57, above as if fully set forth herein and further allege as follows.

104.    Plaintiffs and the Class members have advantageous business and contractual relationships with BB&T pursuant to the mortgage contracts.  Plaintiffs and the Class have legal rights under these mortgage contracts.  For example, Plaintiffs and the Class have a right not to be charged exorbitant charges in bad faith for forced-place insurance.

105.     Assurant has knowledge of the mortgage contracts and the advantageous business and contractual relationships between Plaintiffs and the Class and BB&T.  Assurant is not a party to the mortgage contracts, nor is it a third-party beneficiary of the mortgage contracts.  Further, Assurant does not have any beneficial or economic interest in the mortgage contracts.

106.     Assurant, in bad faith and with the intent to maximize all the Defendants' profits, intentionally and unjustifiably interfered with Plaintiffs' and the Class's rights under the mortgage contracts, as described above, by, *inter alia*, entering into an exclusive relationship with BB&T and its affiliates, whereby they provide kickbacks (in the form of unmerited expense reimbursements or commissions, or reinsurance premiums without the corresponding risk, as well as below cost services) to BB&T in exchange for the exclusive right to force-place inflated and unnecessary premiums which are purposefully and knowingly charged to Plaintiffs and the Class.

107.     Plaintiffs and the Class have been damaged as a result of Assurant's interference with their mortgage contracts by being charged bad faith, exorbitant, and illegal charges for force-placed insurance in contravention of their rights under the mortgages.

**WHEREFORE**, Plaintiffs, on behalf of themselves and all Class members similarly situated, seek a judgment in their favor against Assurant for the actual damages suffered by them as a result of Assurant's tortious interference.  Plaintiffs also seek all costs of litigating this action, including attorneys' fees.

## COUNT VI

## VIOLATIONS OF THE TRUTH IN LENDING ACT, 15 U.S.C. § 1601, et seq.
### (against BB&T)

108.     Plaintiffs re-allege and incorporate paragraphs 1 – 57, above as if fully set forth herein and further allege as follows.

1021690

109.    Plaintiffs' and the Class Members' mortgages were consumer credit plans secured by their principal dwellings, and were subject to the disclosure requirements of the Truth in Lending Act ("TILA"), 15 U.S.C.§ 1601, *et seq.*, and all related regulations, commentary, and interpretive guidance promulgated by the Federal Reserve Board.

110.    BB&T is a "creditor" as defined by TILA because it owned Plaintiffs' mortgage and changed the terms of the mortgage so as to create a new mortgage obligation, of which BB&T was the creditor.

111.    Pursuant to TILA, BB&T was required to accurately and fully disclose the terms of the legal obligations between the parties.  *See* 12 C.F.R. § 226.17(c).

112.    BB&T violated TILA, specifically 12 C.F.R. § 226.17(c), when it: (i) added force-placed insurance charges to Plaintiffs' mortgage obligations and failed to provide new disclosures; and (ii) failed at all times to disclose the amount and nature of the kickback, reinsurance, discount loan monitoring, and/or other profiteering involving BB&T and/or its affiliates as a result of the purchase of force-placed insurance.

113.    When BB&T changed the terms of Plaintiffs' mortgage to allow previously unauthorized kickbacks and insurance amounts in excess of its interests in the property, it changed the finance charge and the total amount of indebtedness, extended new and additional credit through force-placed insurance premiums, and thus created a new debt obligation.  Under TILA, BB&T was then required to provide a new set of disclosures showing the amount of the insurance premiums (i.e. finance charges) and all components thereof.   On information and belief, BB&T increased the principal amount under Plaintiffs' mortgage when they force-placed the insurance, which was a new debt obligation for which new disclosures were required.

114.    BB&T adversely changed the terms of Plaintiffs' loan after origination in order to

30

allow a kickback on force-placed insurance premiums.  These kickbacks are not authorized in the mortgage in any clear and unambiguous way.  BB&T never disclosed to borrowers the amount of the "commissions," "expense reimbursements," or other unearned profits paid to them or their affiliate.

115.    BB&T also violated TILA by adversely changing the terms of Plaintiffs' loan after origination by requiring and threatening to force-place more insurance than necessary to protect its interest in the property securing the mortgages.

116.    Acts constituting violations of TILA occurred within one year prior to the filing of the original Complaint in this action, or are subject to equitable tolling because BB&T's kickbacks, reinsurance, and other unearned revenue-generating scheme was the subject of secret agreements among it and its affiliates and was concealed from borrowers.

117.    Plaintiffs and Class members have been injured and have suffered a monetary loss arising from BB&T's violations of TILA.

118.    As a result of BB&T's TILA violations, Plaintiffs and Class members are entitled to recover actual damages and a penalty of $500,000.00 or 1% of these Defendants' net worth, as provided by 15 U.S.C. § 1640(a)(1)-(2).

119.    Plaintiffs and Class members are also entitled to recovery of attorneys' fees and costs to be paid by BB&T, as provided by 15 U.S.C. § 1640(a)(3).

**WHEREFORE**, Plaintiffs, on behalf of themselves and all Class members similarly situated, seek a judgment in their favor against BB&T awarding actual damages and a penalty of $500,000.00 or 1% of BB&T's net worth, as provided by 15 U.S.C. §1640(a)(1)-(2), as well as of attorneys' fees and costs to be paid by BB&T, as provided by 15 U.S.C. § 1640(a)(3).

1021690

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, on behalf of themselves and all similarly situated individuals, demand judgment against Defendants as follows:

(1)     Declaring this action to be a proper class action maintainable pursuant to Rule 23(a) and Rule 23(b)(1) and (2), or Rule 23(b)(3) of the Federal Rules of Civil Procedure and declaring Plaintiffs and her counsel to be representatives of the Class;

(2)     Enjoining Defendants from continuing the acts and practices described above;

(3)     Awarding damages sustained by Plaintiffs and the Class as a result of BB&T's breaches of the subject mortgage contracts and the implied covenant of good faith and fair dealing, together with pre-judgment interest;

(4)     Finding that Defendants have been unjustly enriched and requiring Defendants to refund all unjust benefits to Plaintiffs and the Class, together with pre-judgment interest;

(5)     Awarding Plaintiffs and the Class costs and disbursements and reasonable allowances for the fees of Plaintiffs' and the Class's counsel and experts, and reimbursement of expenses;

(6)     Awarding actual damages and a penalty of $500,000 or 1% of BB&T's net worth as provided by 15 U.S.C. § 1640 (a)(1)-(2), and attorneys' fees and costs as provided by 15 U.S.C. § 1640 (a)(3)

(7)     Awarding damages sustained by Plaintiffs and the Class as a result of the Assurant's tortious interference; and

(8)     Awarding such other and further relief the Court deems just and equitable.

1021690

## DEMAND FOR JURY TRIAL

Plaintiffs and the Class request a jury trial for any and all Counts for which a trial by jury

is permitted by law.

Respectfully submitted this 20th day of June, 2016.

By: /s/ Robert J. Neary

| | |
|---|---|
| Adam M. Moskowitz, Esq.<br>Florida Bar No. 984280<br>amm@kttlaw.com<br>Thomas A. Tucker Ronzetti, Esq.<br>Florida Bar No. 965723<br>tr@kttlaw.com<br>Rachel Sullivan, Esq.<br>Florida Bar No. 815640<br>rs@kttlaw.com<br>Robert J. Neary, Esq.<br>Florida Bar No. 81712<br>rn@kttlaw.com<br>**KOZYAK TROPIN &**<br>**THROCKMORTON**<br>2525 Ponce de Leon Blvd., 9th Floor<br>Coral Gables, FL 33134<br>Telephone:  (305) 372-1800<br>Facsimile:  (305) 372-3508<br>*Counsel for Plaintiffs* | Lance A. Harke, Esq.<br>Florida Bar No. 863599<br>lharke@harkeclasby.com<br>Sarah Engel, Esq.<br>Florida Bar No. 991030<br>sengel@harkeclasby.com<br>Howard M. Bushman, Esq.<br>Florida Bar No. 0364230<br>hbushman@harkeclasby.com<br>**HARKE CLASBY & BUSHMAN LLP**<br>9699 NE Second Avenue<br>Miami Shores, Florida 33138<br>Telephone:     (305) 536-8220<br>Facsimile:     (305) 536-8229<br>*Counsel for Plaintiffs* |
| Aaron S. Podhurst, Esq.<br>Florida Bar No. 63606<br>apodhurst@podhurst.com<br>Peter Prieto, Esq.<br>Florida Bar No. 501492<br>pprieto@podhurst.com<br>jgravante@podhurst.com<br>Matthew Weinshall, Esq.<br>Florida Bar No. 84783<br>mweinshall@podhurst.com<br>**PODHURST ORSECK, P.A.**<br>City National Bank Building<br>25 West Flagler Street, Suite 800<br>Miami, Florida 33130<br>Telephone: 305-358-2800<br>Facsimile: 305-358-2382<br>*Counsel for Plaintiffs* | Daniel C. Girard, Esq. (*pro hac vice* pending)<br>dcg@girardgibbs.com<br>Elizabeth A. Kramer (*pro hac vice* pending)<br>eak@girardgibbs.com<br>**GIRARD GIBBS LLP**<br>601 California Street, Suite 1400<br>San Francisco CA  94108<br>Phone (415) 981-4800<br>Fax (415) 981-4846 |

33

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the foregoing was filed electronically via CM/ECF on the 20th day of June, 2016 and served by the same means on all counsel of record.

By:  /s/ *Robert J Neary*

1021690