**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**Case No. 1:15-cv-23294-KMW**

BERNARD BEBER, DIANE BEBER,
JULIE LAWSON, and ROBERT LAWSON
on behalf of themselves and
all others similarly situated,

       Plaintiffs,

v.

BRANCH BANKING & TRUST CO. *et al.*,

       Defendants.

_____/


**PLAINTIFFS' MOTION FOR FINAL APPROVAL OF CLASS**
**ACTION SETTLEMENT, APPLICATION FOR SERVICE AWARDS, CLASS**
**COUNSEL'S APPLICATION FOR ATTORNEYS' FEES AND EXPENSES,**
**<u>AND INCORPORATED MEMORANDUM OF LAW</u>**

## INTRODUCTION

Class counsel are proud to present for final approval a class action settlement that will provide more than $6.7 million in meaningful monetary relief to the 45,369 member settlement class and ensure that the lender-placed insurance ("FPI" or "LPI") practices that are the subject of this lawsuit will not continue.[1]  This settlement follows final approval of thirteen similar LPI settlements in this district[2] all of which earned approval after many years of hard-fought litigation of largely the same claims and defenses that were at issue in this case.  Like the settlements in those cases, this settlement will make available significant monetary relief to approximately 45,369 Branch Banking and Trust Company ("BB&T") borrowers nationwide who had hazard, flood, or wind insurance coverage forced on their properties. This settlement resolves the claims of these BB&T borrowers by making available approximately $6.7 million in monetary relief, which likely constitutes the best-case scenario damages recoverable by the class had the parties proceeded to trial.  The prospective portion also guarantees that the LPI practices that were the subject of this litigation, including the prohibition of "commissions" and other illegitimate payments paid to BB&T and its affiliates, will not occur in the future.  As of the date of this filing, the parties have received no objections and only four opt-outs to final approval of the proposed settlement.  This is an extraordinary result.

This result is all the more extraordinary because it involved the resolution of complex issues against a rising tide of adverse decisions from federal districts, including this one, and appellate courts—decisions Class Counsel would certainly distinguish, but their opponents would just as vigorously assert.  For this achievement, Class Counsel are asking the Court to award them $925,000

---

[1] Capitalized terms have the meanings given in the Settlement Agreement attached as **Exhibit A**.

[2] *See Circeo-Loudon v. Green Tree Servicing*, No. 14-cv-21384; *Jackson v. U.S. Bank*, No. 14-cv-21252; *Almanzar v. Select Portfolio Servicing, Inc.*, No. 14-cv-22586; *Wilson v. EverBank, N.A.*, No. 14-cv-22264 (S.D. Fla.); *Braynen v. Nationstar Mortgage, LLC*, No. 14-cv-20726 (S.D. Fla.); *Lee v. Ocwen Loan Servicing LLC*, No. 14-cv-60649 (S.D. Fla.); *Williams v. Wells Fargo Bank, N.A.*, No. 11-cv-21233 (S.D. Fla.); *Saccoccio v. JPMorgan Chase Bank, N.A.*, No. 13-cv-21107 (S.D. Fla); *Fladell v. Wells Fargo Bank, N.A.*, No. 13-cv-60721 (S.D. Fla.); *Diaz v. HSBC Bank (USA), N.A.*, No. 13-cv-21104 (S.D. Fla.); *Hall v. Bank of America, N.A.*, No. 12-cv-22700 (S.D. Fla.); *Hamilton v. SunTrust Mortgage, Inc.*, No. 13-cv-60749 (S.D. Fla.); and *Montoya v. PNC Bank, N.A.*, No. 14-cv-20474 (S.D. Fla.); Ziwczyn v. Regions Bank, No. 15-cv-24558 (S.D. Fla.).

in fees and expenses, negotiated only after all class benefits had been secured under the direct supervision of a nationally recognized mediator, and payable by Defendants beyond and outside of the benefits to the class.  Such a fee would amount to 14% of just the monetary recovery (not including injunctive relief) available to the class, and is well within the parameters established by the Eleventh Circuit, as that court recently confirmed in *Poertner v. Gillette Co.*, 618 Fed. App'x 624, 629 (11th Cir. 2015).

Plaintiffs filed this action in September 2015 and the parties briefed and held oral arguments on Defendants' motions to dismiss.  Plaintiffs also filed a motion for class certification.  Defendants' motions to dismiss and the motion to certify the class were still pending when the parties negotiated this settlement.  Class Counsel and their co-counsel have been investigating and litigating claims against the Assurant Defendants for more than five years, reviewing thousands of pages of documents and taking dozens of depositions, and have become thoroughly familiar with the FPI program and practices that Assurant and its subsidiaries implement with most of the major mortgage lenders.

It was these years of diligent work and hard-fought litigation in this and similar FPI matters by Class Counsel that led to this Settlement.  This result was achieved in a climate where federal courts, including this one, have been dismissing many of the same claims raised here on motions to dismiss or denied motions for class certification.  Class Counsel respectfully request that the Court grant final approval of the settlement, and approve the application for attorneys' fees and Plaintiffs' service awards.

## FACTUAL BACKGROUND

### 1.  Defendants' FPI Practices

BB&T's standard form mortgage agreements require the borrower to maintain hazard, wind, and, where applicable, flood insurance on the property securing his or her mortgage loan, and provide that the lender or servicer may force new coverage on the property at the borrower's expense in the event of a lapse.  The mortgage agreement advises the borrower that the cost of the coverage obtained might significantly exceed the cost of the borrower's voluntary coverage.  Plaintiffs had insurance coverage force placed on their properties by BB&T, and challenge BB&T's arrangement

2

with the Assurant Defendants and their subsidiaries or affiliates.  (*See* Am. Compl., D.E. 97.) Plaintiffs allege that Defendants sought to artificially inflate borrowers' premiums with costs well beyond the cost of coverage, including kickbacks to BB&T or its affiliates, subsidies for below-cost servicing, and other costs unrelated to the procurement of new coverage.  (*Id.*)

## 2.   The *Beber* Litigation

The background and procedural history of this matter is set forth in the Joint Declaration of Class Counsel attached as **Exhibit B** ("Joint Decl.").

## 3.   The Settlement Terms and Agreement

### A.  *The Proposed Class*

The Settlement Agreement provides relief to all borrowers who were charged by BB&T amounts for LPI hazard, flood, or wind coverage for their residential property issued by the Assurant Defendants between January 1, 2009 and June 22, 2016.  (Ex. A ¶ 3.1.)[3]

### B.  *Monetary and Prospective Relief*

The Settlement affords class members significant monetary relief, and prohibits BB&T from engaging in certain practices alleged to inflate the insurance charges imposed on mortgagors for a period of five years.  (*Id.* ¶¶ 4.2-4.6.)  The monetary relief will compensate class members for a significant part of the allegedly inflated portion of the LPI premiums, either by crediting their BB&T accounts for their recovery amount, or by direct payment.  (*Id.* ¶ 4.6.)  All Settlement Class members who paid any portion of the amounts owed for LPI and submit a valid claim form will recover 10%, 8%, or 5% of the net premium *charged* to them during the class period based upon the type of LPI product, the procuring agent, and the date of placement.[4]  (*Id.* ¶¶ 4.6.1, 4.6.2.)  The payment or

---

[3] This class does not exclude borrowers with homes in foreclosure, negotiated short sales, deeds in lieu of foreclosure, or modified loan terms.  By contrast, the court in *Williams* specifically excluded numerous categories that are included in this settlement from the class that it certified in February 2012. *See Williams*, (D.E. 211).

[4] Eligible class member who were charged by BB&T for a hazard, flood, or wind FPI policy procured by BB&T Insurance Services, Inc. on or before December 31, 2012 will receive a credit or payment equal to 10% of the net premium.  Eligible class members who were charged by BB&T for a hazard FPI policy procured by ASIC before June 1, 2014 will receive a credit or payment equal to 8% of the net premium. Eligible class members charged by BB&T for a hazard, flood, or wind

10B1026

credit to class members is calculated based on the entire premium, rather than that portion that is alleged to have been inflated, since a considerable portion of the premiums charged, in fact, were applied to pay for insurance to cover the borrower's property.

The prospective relief provided by the settlement will ensure that BB&T does not engage in the practices that are the subject of this lawsuit.  The Settlement Agreement prohibits BB&T from charging what Plaintiffs allege are inflated amounts for LPI and accepting an illegitimate financial interest in its placement.  For a period of five years following the Final Settlement Date, BB&T is prohibited from accepting commissions for LPI; entering into quota-share reinsurance arrangements with Assurant; or accepting illegitimate payments for administrative or other services.  (Ex. A ¶ 4.2.1.)  The Assurant Defendants will similarly be prohibited for five years from providing LPI commissions to BB&T-affiliated agents, entering into reinsurance arrangements, and accepting from BB&T illegitimate payments for below-cost or free outsourced services.  (*Id*. ¶ 4.3.1.)

The Settlement also binds BB&T to establish LPI coverage at the last-known coverage amount, replacement cost value, or the unpaid principal balance on a borrower's loan, so that lender-placed coverage bears some relation to the value of the interest being protected.  (*Id*. ¶ 4.2.1.)  BB&T will also advance funds to continue coverage under the borrower's voluntary policy in the event the policy is eligible to be renewed, if BB&T receives notice of a lapse for nonpayment of premium, and if the borrower's loan is escrowed for insurance, thus ensuring the number of LPI policies issued by Defendants is reduced. (*Id*.)  Finally, the settlement requires BB&T to refund any amounts due the borrower once voluntary insurance is secured within fifteen days of receipt of proof of the voluntary coverage.  (*Id*.)

### C. *Release of Claims against Defendants*

In exchange for the settlement relief, Settlement Class members will release Defendants and their former and current subsidiaries, affiliates, divisions, parents, and other affiliated companies,

---

policy, procured by ASIC on or after June 1, 2014 will receive a payment of 5% of the net premium. Eligible class members who were charged by BB&T for a hazard, flood, or wind policy procured by Overby-Seawell Company on or after January 1, 2013 will receive a credit or payment of 5% of the net premium.

among others, from, in sum, all claims, defenses, obligations, or damages that were or could have been sought in this litigation or that relate, concern, arise for or pertain in any way to Defendants' conduct, policies, or practices concerning the LPI policies.  (*Id.* ¶ 10.)

### D.  *Class Notice*

The Settlement Agreement provides that class members will receive notice of the settlement by first-class mail at their last known mailing address in the form of notice attached to the Settlement Agreement.[5]  (*Id.* ¶ 6.1.; *see also* Declaration of Settlement Administrator Ann Haan ("Haan Decl." attached as **Exhibit C**.)  The notice will be mailed no less than ninety days before the final approval hearing. (Ex. A. 6.1.)   The Settlement Administrator will establish a website on which class members can download or print a claim form and review the Settlement Agreement, and upload and file a claim form electronically.  (*Id.* ¶¶ 6.2, 7.1.)  The Settlement Administrator will also establish a toll-free number that class members can call for information, or to raise any questions or concerns.  (*Id.* ¶ 7.2.3.)  The Settlement Administrator will publish notice of the settlement in *USA Today* no fewer than forty-five days before the Final Fairness Hearing.  (*Id.* ¶ 6.3.)  Class members may opt out of the settlement by sending a request for exclusion to the Settlement Administrator.  (*Id.* ¶ 11.)

### E.  *Claims Process*

To obtain relief from Defendants, the Settlement Agreement requires class members to submit a claim form before the deadline which will be sixty days after the Final Settlement Date.  (*Id.* ¶¶ 2.9., 7.1.)  The claims will be reviewed by the Settlement Administrator, who will then make the final determination of the amount owed each class member using Defendants' electronic records, and have 180 days after the Final Settlement Date to distribute checks to borrowers who paid the amounts owed them for LPI.  (*Id.* ¶¶ 7.3, 7.3.3.)  Defendants will have 90 days after the Settlement Administrator provides a list of valid claims within which to either credit the appropriate amount or to cause the Settlement Administrator to issue checks to class members who still owe amounts for LPI.   (*Id.* ¶ 7.3.4.)  The Settlement Administrator will also notify Class Counsel on a weekly basis

---

[5] In the event that a notice is returned as undeliverable, the Settlement Administrator will access the National Change of Address database and attempt to locate the class member.  (*Id.* ¶ 6.1.)

of any class members who submit deficient claims so that Class Counsel may assist in curing any deficiency. (Id. ¶ 7.2.1.)  The Settlement Administrator will also send notice to Class members with deficient forms identifying the deficiency.  (*Id.*)

>  **F.  *Class Counsel Fees and Expenses and the Named Plaintiffs' Case Contribution Award***

The Court has already appointed the law firms of Kozyak Tropin & Throckmorton LLP, Podhurst Orseck, P.A., and Harke Clasby & Bushman, LLP to serve as Lead Class Counsel for the class.  (D.E. 101.)  Pursuant to Section 15 of the Settlement Agreement, Class Counsel's application for attorneys' fees and expenses shall be $925,000.  (*Id.* ¶¶ 15.1, 15.2.)  Defendants also agree to pay a Case Contribution Award to each named plaintiff in the amount of $5,000.00.  (*Id.* ¶ 15.4.) The Court will consider whether to grant or deny these awards separate and apart from its analysis of the fairness, reasonableness, and adequacy of the settlement.  (*Id.* ¶ 15.5.)

## 4.   Preliminary Approval and Settlement Administration

The Court preliminarily approved the settlement and certified the proposed Settlement Class on August 12, 2016. (D.E. 101.)  The Court approved all terms, including the proposed Notice and notice plan, and ordered the parties to mail the Notice, Claim Instructions, and Claim Form to all class members.  (*Id.*)

The Settlement Administrator, Rust Consulting ("Rust"), obtained class member records from Defendants, including the last-known names and mailing addresses for all persons meeting the class definition.  (Haan Decl. at ¶ 5.)  Rust updated the mailing list and standardized the address information using the U.S. Postal Service database.  (*Id.* ¶ 7.)  Rust mailed notice packets to a total of 45,369 class members.  (*Id.* ¶ 8.)  Rust also activated the settlement website (*id.* at ¶ 10), and published an internet banner ad with over nine million targeted internet banners and impressions disseminated. (*Id.* ¶¶ 10, 12.) Rust published notice in *USA Today* on October 19, 2016 (*id.* ¶ 12.), and established a toll-free telephone line that is accessible 24 hours a day, 7 days a week for class members who seek additional information.  (*Id.* ¶ 6.)

The deadline for opt-outs is December 12, 2016. As of the date of this filing, Rust had received only four valid opt-out requests, representing only .00008% of the settlement class.  (*Id.* ¶¶ 13, 14.)  As of the date of this Motion, no objections have been filed with the Court.

10B1026

**LEGAL ARGUMENT**

I.    **THE COURT SHOULD GRANT FINAL APPROVAL OF THE SETTLEMENT.**

Settlement "has special importance in class actions with their notable uncertainty, difficulties of proof, and length.  Settlements of complex cases contribute greatly to the efficient utilization of scarce judicial resources, and achieve the speedy resolution of justice[.]" *Turner v. Gen. Elec. Co.*, No. 2:05-cv-186, 2006 WL 2620275, at *2 (M.D. Fla. Sept. 13, 2006) (citation omitted).  For these reasons, "there exists an overriding public interest in favor of settlement, particularly in class actions that have the well-deserved reputation as being most complex." *Lipuma v. Am. Express Co.*, 406 F. Supp. 2d 1298, 1314 (S.D. Fla. 2005) (citation omitted).  Courts in this circuit consider the following factors:  (1) the existence of fraud or collusion behind the settlement; (2) the complexity, expense and duration of litigation; (3) the stage of proceedings at which the settlement was achieved and the amount of discovery completed; (4) the probability of the plaintiffs' success on the merits; (5) the range of possible recovery; and (6) the opinions of class counsel, class representatives, and the substance and amount of opposition received.  *See Saccoccio* Order at 9; *Leverso v. SouthTrust Bank of Ala., N.A.*, 18 F.3d 1527, 1530 n.6 (11th Cir. 1994).  "In assessing these factors, the Court 'should be hesitant to substitute ... her own judgment for that of counsel.'" *Lipuma*, 406 F. Supp. 2d at 1315 (quoting *In re Smith,* 926 F.2d 1027, 1028 (11th Cir. 1991)).  Analysis of these factors compels the conclusion that the Court should approve the Settlement.

A.    **The *Beber* Settlement Is the Product of Good Faith, Informed, and Arms'-Length Negotiations among Experienced Counsel.**

The first factor for final approval requires the Court to consider whether the settlement was obtained by fraud or collusion among the parties and their counsel.  Courts begin with a presumption of good faith in the negotiating process.  *See Saccoccio v. JP Morgan Chase Bank, N.A.,* 297 F.R.D. 683, 692 (S.D. Fla. 2014) ("Where the parties have negotiated at arm's length, the Court should find that the settlement is not the product of collusion")*; Hemphill v. San Diego Ass'n of Realtors, Inc.*, 225 F.R.D. 616, 621 (S.D. Cal. 2004) ("the courts respect the integrity of counsel and presume the absence of fraud or collusion in negotiating the settlement").  The settlement terms in this case are the product of significant give and take by the settling parties, and were negotiated at arms' length.

7

The parties participated in a mediation before Jonathan Marks and subsequent negotiations over several weeks. (Joint Decl. ¶¶ 11-20.)

The parties through regular telephonic sessions and email communications, with the assistance of Mr. Marks, negotiated first the terms of an initial memorandum of understanding and then a final settlement agreement. (*Id.*) Mr. Marks has significant experience mediating complex commercial suits to resolution, and was involved at every step of the process. (*Id.* ¶ 42.) The very fact of his involvement weighs in favor of approval. *See, e.g., Lobatz v. U.S. In re Educ. Testing Serv. Praxis Principles of Learning & Teaching, Grades 7-12 Litig.*, 447 F. Supp. 2d 612, 619-20 (E.D. La. 2006) (use of special master to oversee mediation evidenced procedural fairness of negotiating process); *In re WorldCom, Inc. ERISA Litig.*, 2004 WL 2338151, at *6 (S.D.N.Y. 2004) (fact that "[a] respected and dedicated judicial officer presided over the lengthy discussions from which this settlement emerged" belied any suggestion of collusion).

The parties' negotiations were also informed by considerable discovery and institutional knowledge obtained by Class Counsel in litigating LPI claims involving the Assurant Defendants in at least thirteen class actions over the last four years. (Joint Decl. ¶¶ 38-41, 45); *see, e.g., Fladell v. Wells Fargo Bank, N.A.*, No. 13-cv-60721 (S.D. Fla.); *Diaz v. HSBC Bank (USA), N.A.*, No. 13-cv-21104 (S.D. Fla.); *Saccoccio v. JPMorgan Chase Bank*, No. 13-cv-21107 (S.D. Fla.).

**B. The Issues Presented Were Highly Complex, and Settlement Approval Will Save the Class Years of Extremely Costly Litigation in this Court and on Appeal.**

This case involves complex legal claims and defenses brought on behalf of 45,369 class members, (Haan Decl. ¶ 8), and includes claims for complex common law contractual, quasi-contractual, and tort claims as well as a claim for violation of the federal Truth in Lending Act. (D.E. 97.) Litigating these claims would have undoubtedly proven difficult and consumed significant time, money, and judicial resources. Even if Plaintiffs were ultimately to have prevailed in this litigation (which Defendants contest), that success would likely have borne fruit for the Class only after years of trial and appellate proceedings and the expenditure of millions of dollars by both sides. (Joint Decl. ¶¶ 3, 43, 46); s*ee, e.g., In re Oil Spill by Oil Rig Deepwater Horizon in Gulf of Mex., on Apr. 20, 2010*, 910 F. Supp. 2d 891, 932 (E.D. La. 2012) *aff'd* 2014 WL 103836 (5th Cir. Jan. 10,

2014) ("Even assuming litigation could obtain the results that this Settlement provides, years of litigation would stand between the class and any such recovery. Hence, this second factor weighs strongly in favor of granting final approval to the Settlement Agreement.").

By contrast, the settlement provides immediate and substantial monetary relief to the Settlement Class, with payments and credits approximating a significant percentage of class members' actual damages.  (Joint Decl. ¶¶ 54, 58.)   This range is extremely favorable, and constitutes an excellent result.   *See, e.g., Hamilton*, No. 13-cv-60749 (S.D. Fla.) (D.E. 178); *Saccoccio,* 297 F.R.D. at 693 (return of 12.5% of premiums charged for FPI with prospective relief "very likely exceeds what Plaintiffs could have won at trial"); *In re Checking Account Overdraft Litig.*, 830 F. Supp. 2d 1330, 1346 (S.D. Fla. 2011) (range of 9% to 45% of damages was an "exemplary" result).  These benefits come without the expense, uncertainty, and delay of continued and indefinite litigation.  In light of the costs, uncertainties, and delays of litigating through trial— to say nothing of an appeal—"the benefits to the class of the present settlement become all the more apparent." *See Ressler v. Jacobson*, 822 F. Supp. 1551, 1555 (M.D. Fla. 1992).

### C.  The Factual Record Was Sufficiently Developed to Enable Class Counsel to Make a Reasoned Judgment Regarding the Settlement.

Courts consider "the degree of case development that class counsel have accomplished prior to settlement" to ensure that "counsel had an adequate appreciation of the merits of the case before negotiating." *In re Gen. Motors Pick-up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 813 (3d Cir. 1995).  At the same time, "[t]he law is clear that early settlements are to be encouraged, and accordingly, only some reasonable amount of discovery should be required to make these determinations." *Ressler*, 822 F. Supp. at 1555.

Prior to settlement, Class Counsel and their co-counsel had been litigating claims against the Assurant Defendants for approximately five years, and had familiarized themselves thoroughly with the mechanics of Assurant's LPI program.  (Joint Decl. ¶¶ 38, 39.)   Further, before, during, and after mediation, Class Counsel confirmed details of Defendants' LPI program, the class members affected, and the amount at stake to ensure that the settlement was fair and complete, and to confirm the value of the relief provided to the class.  (*Id.* ¶¶ 12-13.)  Plaintiffs also confirmed during

9

mediation with Defendants that a claims-made structure would provide the best possible relief to class members.  (*Id*. ¶¶ 34-35.)

### D.  Plaintiffs Faced Significant Obstacles to Obtaining Relief.

"[T]he likelihood and extent of any recovery from the defendants absent … settlement" must be considered in assessing the reasonableness of a settlement. *See In re Domestic Air Transp. Antitrust Litig.*, 148 F.R.D. 297, 314 (N.D. Ga. 1993); *see also Ressler*, 822 F. Supp. at 1555 ("a court is to consider the likelihood of the plaintiffs' success on the merits of his claims against the amount and form of relief offered in the settlement before judging the fairness of the compromise"). Class Counsel and Plaintiffs believe they have a compelling case, but also recognize that Defendants have raised significant defenses to all claims, including application of the filed-rate doctrine, failure to mitigate damages, statutes of limitation, and unclean hands.  (*See e.g.* D.E. 99.)   Although Plaintiffs and Class Counsel maintain that these defenses lack merit, had litigation continued, Plaintiffs and class members would have risked not prevailing on their claims.  (Joint Decl. ¶¶ 3, 45-50); *see Patel v. Specialized Loan Servicing, LLC,* No. 15-cv-62600, 2016 WL 1663827 (S.D. Fla. April 25, 2016) (dismissing lender-placed insurance case due to application of the filed-rate doctrine); *Fowler v. Caliber Home Loans, Inc*., NO. 15-cv-24542, 2016 WL 4761838 (S.D. Fla. Sept. 13, 2016) (same).   Further, the court in *Saccoccio* noted the "headwinds created by" the Eleventh Circuit in *Feaz v. Wells Fargo Bank, N.A.,* 798 F.3d 1098 (11th Cir. 2014) and the Seventh Circuit in *Cohen v. American Security Insurance Co*., 735 F.3d 601 (7th Cir. 2013).  *See Saccoccio,* 297 F.R.D. at 693; *Montoya v. PNC Bank, N.A*., No. 14-cv-20474, 2014 WL 4248208 at *1, *9 (S.D. Fla. Aug. 27, 2014) (noting same), and the Second Circuit has held that the filed-rate doctrine applies to bar claims against insurers in the LPI context.  *See Rothstein v Balboa Ins. Co..*, 790 F.3d 256 (2d Cir. 2015).  Had the parties continued to litigate, and the tide turned, Plaintiffs could have stood to recover nothing on behalf of a nationwide class.

### E.  The Benefits Provided by the Settlement Are Fair, Reasonable, and Adequate When Considered Against the Possible Range of Recovery.

As explained above, the settlement offers approximately $6.7 million in monetary benefits to the class, as well as prospective relief and separately paid attorneys' fees.  This will make

available a significant percentage of claimants' actual potential damages, which meets and likely exceeds the standards established by this and other courts.  (Joint Decl. ¶¶ 54, 58); *see, e.g., Behrens v. Wometco Enter. Inc.*, 118 F.R.D. 534, 542 (S.D. Fla. 1988) ("the fact that a proposed settlement amounts to only a fraction of the potential recovery does not mean the settlement is unfair and inadequate … A settlement can be satisfying even if it amounts to a hundredth or even a thousandth of a single percent of the potential recovery[.]"); *Linney v. Cellular Alaska P'ship*, 151 F.3d 1234, 1242 (9th Cir. 1998) ("the very essence of settlement is … a yielding of absolutes and an abandoning of highest hopes").  For example, in *Almanzar*, this Court approved a similar settlement with payments to the class amounting to 12.5%, 6.5% or 5% of the net premium charged to them.  *See Almanzar v. Select Portfolio Servicing, Inc.,* No. 14-cv-22586, (S.D Fla., D.E. 113.)

Similarly, in *LiPuma v. American Express Co.,* 406 F. Supp. 1298 (S.D. Fla. 2005), this Court found that a settlement that recovered 8.1% of the possible damages was fair, adequate, and reasonable.  When valuing the total recovery, this Court included the cash fund, the proposed value of the prospective relief, and the costs of notice and administration.  *Id*. at 1322.  The Court focused on "the possible recovery at trial" and evaluated the settlement in its "totality" and not on a "claim-by-claim" or "dollar-by-dollar" basis.  *Id*.  Further, the presence of "strong defenses to the claims" makes lower recoveries more reasonable, *id*; *see also Checking Account Overdraft Litig.*, 830 F. Supp. 2d 1346 ("standing alone, nine percent or higher constitutes a fair settlement even absent the risks associated with prosecuting these claims."),[6] and "when settlement assures immediate payment of substantial amounts to class members, even if it means sacrificing speculative payment of a hypothetically larger amount years down the road, settlement is reasonable[.]" *Johnson v. Brennan*, No. 10-cv-4712, 2011 WL 4357376, at *12 (S.D.N.Y. Sept. 16, 2011) (citation and quotations omitted).

---

[6] *See also Bennett v. Behring Corp.*, 737 F.2d 982, 986 (11th Cir. 1984) (holding a 5.6% recovery was fair and adequate in view of the risks of further litigation and litigation objectives); *In re Rite Aid Corp. Sec. Litig.,* 146 F. Supp. 2d 706, 715 (E.D. Pa. 2001) (noting that since 1995, class action settlements have typically "recovered between 5.5% and 6.2% of the class members' estimated losses").

Here, the Settlement Agreement provides that all class members are eligible to receive 10%, 8%, or 5% of the net premium charged to them during the class period based upon the type of LPI product, the procuring agent, and the date of placement, in the form of either a check or a credit to their BB&T accounts.  (Ex. A ¶ 4.6.2.; *see* n. 4, *supra*)  This amount will be a percentage of the entire premium charged, some of which legitimately went to purchasing insurance coverage to which BB&T was entitled to protect its interest in the borrower's property—*not* a percentage of the premium charged in excess of the actual or competitive cost of coverage.  (*Id.*)  Moreover, all class members who submit a claim form will recover the amount regardless of whether the class members paid any portion of that premium.  (Joint Decl. ¶ 23.)

The percentage made available to many class members by the settlement approximates the amount of the unwarranted "commissions" or "expense reimbursements" paid by borrowers subject to other lenders' LPI schemes with Assurant.  *See, e.g., Kunzelmann*, No. 11-cv-81373 (S.D. Fla.) (D.E. 115 at 2) (citing evidence that Wells Fargo and Assurant charged an 11% "commission").  Moreover, more than forty-five state regulators have in recent years approved an LPI hazard insurance product developed by Assurant that would reduce the rates used to calculate the premiums charged to lenders (and then passed on to borrowers) by up to 12.5% if the lender agrees to forego the commissions and reinsurance profits that are the subject of this lawsuit.  (Joint Decl. ¶ 55.)  This supports a finding of reasonableness here.

The Settlement will also provide valuable prospective relief to the class.  (Joint Decl. ¶¶ 2, 24, 25.)  The Settlement Agreement effectively ensures that BB&T will not implement the practices challenged in the litigation.  (*Id.*).  Certain of these practices were proscribed by a settlement with New York state regulators before the parties here settled the class claims, but the New York injunction applies only to New York borrowers and binds only the Assurant Defendants, leaving BB&T free to reinstitute the challenged practices with another insurer. *See* Consent Order, *In the Matter of Am. Sec. Ins. Co., et al.* (N.Y.D.F.S. 2013), available at http://www.dfs.ny.gov/about/press2013/assur-order-130321.pdf ("NYDFS Consent Order").  There can be no question that this result is more than reasonable.

The fact that the parties agreed to a "claims-made" settlement does not render its terms

unreasonable. *See, e.g., Saccoccio*, 297 F.R.D. at 696 (overruling objections to claims-made process because "[t]here is nothing inherently suspect about requiring class members to submit claim forms in order to receive payment.") (citing to *Schulte v. Fifth Third Bank*, 805 F. Supp. 2d 560, 593 (N.D. Ill. 2011)); *Casey v. Citibank*, No. 12-cv-820 (N.D.N.Y.) (D.E. 222 at ¶ 6) (approving virtually identical claims- made settlement and finding that regardless of the take rate, "[t]he settlement confers substantial benefits upon the Settlement Class members, is in the public interest, and will provide the parties with repose from litigation."); *Williams v. MGM-Pathe Commc'ns Co.*, 129 F.3d 1026, 1027 (9th Cir. 1997) (discussing claims-made settlement and affirming contingency fee award based on total possible recovery); *Shames v. Hertz Corp.*, 07-cv-2174, 2012 WL 5392159 (S.D. Cal. Nov. 5, 2012) (approving claims-made settlement over objections because "there is nothing inherently objectionable with a claims-submission process, as class action settlements often include this process, and courts routinely approve claims-made settlements") (citations omitted); *Lemus v. H & R Block Enters. LLC,* No. 09-cv-3179, 2012 WL 3638550 (N.D. Cal. Aug. 22, 2012) (approving claims-made settlement where unclaimed funds reverted to the defendants); *Atkinson v. Wal-Mart Stores, Inc.*, No. 08-cv-691-T-30TBM, 2011 WL 6846747, at *5 (M.D. Fla. Dec. 29, 2011) (approving claims-made settlement with full reversion). The parties agreed to a "claims-made" process because BB&T cannot determine on a system-wide basis the amount paid or currently owed by a borrower. (Joint Decl. ¶¶ 33-34.)

In *Williams v. Wells Fargo Bank, N.A.*, No. 11-cv-21233-RNS (S.D. Fla.), for example, a Wells Fargo representative testified during his deposition that "[w]ithout a borrower-by-borrower manual examination of each loan file, [Wells Fargo's systems] cannot accurately determine the universe of borrowers who were 'charged' for lender placed insurance, those who 'paid' for lender placed insurance, those who still owe Wells Fargo Bank for lender placed insurance premiums, and those who may have entered into loan modification, short sale, refinance, or other agreements with Wells Fargo Bank." *See Williams,* (D.E. 307 Ex. A at 2). Wells Fargo's Rule 30(b)(6) representative testified that the review could range from "maybe a few hours" to "four to five hours" per loan. *See Williams,* (D.E. 307 at Exhibit B at 46:16-19) ("If the loan was still active and that information is readily available on our system, I would say review would take maybe a few hours.

If it is an older loan that is no longer viewable on our system, then that review process would probably double up to probably four to five hours because we would be working off of paper to calculate those dollar amounts as well as retrieving archived documents in order to complete our review.").

Like Wells Fargo, BB&T's systems cannot determine such information on a class-wide basis, a manual review of each of the 45,369 class members' borrower files would be required to determine who paid, how much they paid, and who currently owes premiums for lender-placed insurance.   (Joint Decl. ¶¶ 34-35.)  Notably, Assurant's settlement with New York state regulators was also a claims-made settlement.  *See* NYDFS Consent Order.

Plaintiffs and the class faced significant hurdles in litigating their claims to resolution.  Each class member stands to recover hundreds, if not thousands, of dollars as a result of the settlement. These results fall well within the range of reasonableness.

### F.   The Opinions of Class Counsel, the Class Representative, and Absent Class Members Strongly Favor Settlement Approval.

A court should give "great weight to the recommendations of counsel for the parties, given their considerable experience in this type of litigation." *Warren v. Tampa*, 693 F. Supp. 1051, 1060 (M.D. Fla. 1988).  This Court has already found that Class Counsel and Plaintiffs will adequately represent the class in this action, and its conclusion was warranted.  (D.E. 101 at ¶ 5(e) ("Plaintiffs are capable of fairly and adequately protecting the interests of the members of the Settlement Class, in connection with the Settlement Agreement.")).

Class Counsel have been investigating LPI practices for more than five years, and fully support the Settlement.  Among other things, they obtained certification of the first LPI class in Florida in *Williams v. Wells Fargo Bank, N.A.*, No. 11-cv-21233 (S.D. Fla. Feb 21, 2012), litigated the motion for class certification in *Montoya*, briefed and argued two motions to centralize LPI litigation in a nationwide MDL, obtained final approval of the settlements in *Saccoccio*, *Hall*, *Fladell*, *Diaz*, *Hamilton*, *Braynen, Wilson*, *Lee*, *Jackson*, *Circeo-Loudon*, *Montoya*, and *Almanzar*, and are currently litigating additional cases against major mortgage lenders before this Court and

14

others.[7]   Based on this experience, and decades of experience litigating consumer class action lawsuits, it is Class Counsel's informed opinion that the Settlement is fair, reasonable, adequate, and in the best interests of the Class.  (Joint Decl. ¶ 93.)

As of November 11, 2016, of the 45,369 class members, none have objected and four have filed valid opt out requests.  (Haan Decl. ¶¶ 13, 14.)  This overwhelming class support is evidence of the settlement's fairness.  *See, e.g., Saccoccio*, 297 F.R.D. at 694 (opposition amounting to .018% of the class was termed as "low resistance to the settlement" and weighed "in favor of approving the settlement."); *Churchill Village LLC v. Gen. Elec.*, 361 F.3d 566, 577 (9th Cir. 2004) (affirming settlement with 45 objections out of 90,000 notices). Viewed either independently or taken together, the above factors confirm that the settlement is fair, reasonable, and adequate and in the best interests of the Class.

## II.   CLASS COUNSEL SHOULD BE AWARDED REASONABLE FEES AND COSTS AND PLAINTIFFS THE REQUESTED SERVICE AWARD.

For their extensive work prior to the filing of the complaint and throughout the pre-trial and settlement phases of this litigation, Class Counsel seek $925,000 in attorneys' fees and expenses, equaling only 14% of the over $6.7 million in monetary settlement benefits provided to the class, excluding the valuable and important prospective relief.  A service award of $5,000 to each Class Representative is also appropriate.

### A.   The Court Should Award the Requested Attorney's Fees and Expenses.

Class Counsel is entitled to attorneys' fees for the benefit obtained in a class settlement.  *See Saccoccio*, 297 F.R.D. at 695 ("The attorneys' fees in a class action can be determined based upon the total fund, not just the actual payout to the class."); *Casey*, No. 12-cv-00820 (N.D.N.Y.) (ECF No. 223); *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478, 676 (1980); *David v. Am. Suzuki Motor Corp*., No. 08–CV–22278, 2010 WL 1628362 (S.D. Fla. Apr. 15, 2010) (settlement with ascertainable benefits may be treated as a common fund to which a percentage fee may be awarded, even if the fee is separately paid by the defendant).  In the Eleventh Circuit, "attorneys' fees awarded

---

[7] *See McNeil v. Selene Finance,* No. 16-cv-22930 (S.D. Fla.) and *Bowles v. Fay Servicing*, No. 16-cv-02714 (D.N.J.).

from a common fund shall be based upon a reasonable percentage of the fund established for the benefit of the class." *Camden I Condo. Ass'n v. Dunkle,* 946 F.2d 768, 774 (11th Cir. 1991); *see also Pinto v. Princess Cruise Lines, Ltd.*, 513 F. Supp. 2d 1334, 1339 (S.D. Fla. 2007); *In re Sunbeam Sec. Litig.,* 176 F. Supp. 2d 1323, 1333 (S.D. Fla. 2001). The percentage applies to the total benefits provided, even where the actual payments to the class following a claims process is lower.  *See Poertner*, 618 Fed. App'x at 630; *Saccoccio*, 297 F.R.D. at 695; *Waters v. Int'l Precious Metals Corp.,* 190 F.3d 1291, 1295-96 (11th Cir. 1999); *see also Casey*, No. 12-cv-00820 (N.D.N.Y.) (D.E. 221) (the amount of claims made is "irrelevant to the underlying issue; to wit, whether the proposed settlement agreement is fair, reasonable, and adequate").

"[F]ederal district courts across the country have, in the class action settlement context, *routinely* awarded class counsel fees in excess of the 25 percent 'benchmark,' even in so-called 'mega-fund' cases." *Allapattah Servs., Inc. v. Exxon Corp.*, 454 F. Supp. 2d 1185, 1210 (S.D. Fla. 2006) (emphasis added; awarding fees of 31½% of settlement fund).  Here, the requested percentage falls within or below the range provided by the Eleventh Circuit.  *See Camden I,* 946 F. 2d at 774 (20%−50% of the value provided); *David*, 2010 WL 1628362 at *8 n.15 (20%-50% of common fund is "the customary fee in class actions that result in substantial benefits").

The Eleventh Circuit's factors for evaluating the reasonable percentage to award class-action counsel are (1) the time and labor required; (2) the novelty and difficulty of the questions involved; (3) the skill requisite to perform the legal service properly; (4) the preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the  attorneys; (10) the "undesirability" of the case; (11) the nature and the length of the professional relationship with the client; and (12) awards in similar cases. *See Camden I,* 946 F.2d at 772 n.3.  The Court may also consider the time required to reach settlement, the existence of substantial objections and non-monetary benefits, and the economics of prosecuting a class action.  *Id.* at 775.  As explained below, the factors set forth in *Camden I* support the full award requested.

16

**1. The Contingent Nature of the Fee, the Financial Burden Carried by Counsel, and the Economics of Prosecuting a Class Action Support the 14% Award.**

A determination of a fair fee for Class Counsel must include consideration of the contingent nature of the fee, the outlay of out-of-pocket expenses by Class Counsel, and the fact that the risks of failure and nonpayment in a class action are extremely high.  *See Pinto*, 513 F. Supp. 2d at 1339.  These factors weigh in favor of awarding Class Counsel 14% of the cash benefits obtained.  Class Counsel received no compensation during the course of this litigation and have incurred expenses litigating on behalf of the Class, which they risked losing had Defendants prevailed.  (Joint Decl. ¶¶84-89.)  From the time Class Counsel filed suit, there existed a real possibility that Class Counsel would receive no compensation.  (*Id*.).

**2. The Requested Fees Reflect the Market Rate in Complex, Contingent Litigation.**

A fee of 14% of the cash value is below the market for class actions.  *See Saccoccio*, 297 F.R.D. at 695 ("20-30% fee that is customary in common fund cases.").  "The percentage method of awarding fees in class actions is consistent with, and is intended to mirror, practice in the private marketplace where attorneys typically negotiate percentage fee arrangements with their clients." *Pinto*, 513 F. Supp. 2d at 1340.  In private litigation, attorneys regularly contract for contingent fees between 25% and 33% directly with their clients.  These percentages are the prevailing market rates throughout the United States for contingent representation.  *See id.* at 1341 (citing, *inter alia*, *Kirchoff v. Flynn*, 786 F.2d 320, 323 (7th Cir. 1986)).  In making a determination of what constitutes a fair fee, this Court should be guided by such awards.[8]

A fee of approximately 14% of the total monetary benefits obtained is consistent with and falls well within, if not below, the range of the customary fee awarded in common fund cases, many of which have awarded a higher percentage.  *See, e.g., Hamilton v. SunTrust Mortgage, Inc.*, No. 13-cv-60749 at (D.E. 178) (awarding 16% of the total monetary benefits provided).

---

[8]  *See also, e.g., Gutter v. E.I. Dupont De Nemours & Co.,* 95–2152–Civ–Gold (S.D. Fla. May 30, 2003) (33-1/3 %); *Waters,* 190 F.3d 1291 (affirming 33-1/3%); *Tapken v. Brown,* Case No. 90-0691-CIV, 1992 WL 178984, Fed. Sec. L. Rep. P 96805 (S.D. Fla. 1995) (33%); *In re Home Shopping Network Sec. Litig.,* Case No. 87-428-T-13(A) (M.D. Fla. 1991) (33%).

17

### 3.  The Novelty and Difficulty of the Questions at Issue

This case presents difficult questions of law and complex issues of fact.  Class actions are generally complex, but this one is particularly so, involving: federal statutes, insurance issues such as analyzing loss ratios, calculation of premiums, and identifying permissible costs of insurance charged to borrowers; defenses that contemplate the actions of insurance regulators or go to the conduct of the borrower in allowing voluntary coverage to lapse (first breach, unclean hands); "consent" defenses involving payment/maintenance of LPI after disclosures that it would be expensive, *e.g.,* voluntary payment, waiver, and estoppel.  The difficulty of litigating these issues amply supports the full award requested.  (Joint Decl. ¶¶ 69-83.)

### 4.  The Skill, Experience, and Reputation of Class Counsel

Class Counsel have established their skill, experience, and reputation in the record, and in repeated cases before this court.  Indeed, this Court stated that "class counsel has been at the forefront of lender-placed insurance litigation." *See Saccoccio*, 297 F.R.D. at 695.  Beyond that, Class Counsel's reputation, diligence, expertise, and skill are reflected in the results they have achieved.  They resolved this dispute efficiently despite the potential hurdles and the arguments raised by Defendants. The quality of Class Counsel and their achievement in this case is equally shown by the strength of their opponents Carlton Fields Jorden Burt P.A. and Buckley Sandler, LLP reputable firms known for the skills and achievements of their attorneys.  This factor thus also favors awarding the requested fee.

### 5.  The Result Achieved for the Class

The result achieved is a major factor to consider in making a fee award and here, it is significant and perhaps best establishes the propriety of the requested fee award.  *See Hensley v. Eckerhart,* 461 U.S. 424, 436, (1983) ("critical factor is the degree of success obtained"); *Pinto*, 513 F. Supp. 2d at 1342; *Behrens,* 118 F.R.D. at 547-48 ("The quality of work performed in a case that settles before trial is best measured by the benefit obtained.").  In considering the results, courts examine the value of *both* monetary and prospective relief.  *See Poertner*, 618 Fed. App'x at 629; *Perez v. Asurion Corp.*, 501 F. Supp. 2d 1360 (S.D. Fla. 2007); *LiPuma,* 406 F. Supp. 2d at 1323; *In re Managed Care Litig.*, 2003 WL 228500700, at *6 (S.D. Fla. Oct. 24, 2003).  The results here,

18

over $6.7 million in cash and the prospective relief, are excellent. Defendants are mandated to cease the key practices which are the gravamen of the Amended Complaint. These results are powerful evidence supporting the fee award.

### 6. The Time and Labor of Class Counsel

Investigating, prosecuting, and settling the claims here demanded considerable time and labor. (Joint Decl. ¶¶ 69-74.) The complexity of this case required organization by Class Counsel, including assignment of work and regular meetings and calls to ensure coordinated, productive work efforts to maximize efficiency and minimize duplication of effort. (*Id*.) Class Counsel spent many hours investigating the claims of many of the potential plaintiffs against Defendants in this action. (*Id*.) Class Counsel interviewed BB&T borrowers and potential plaintiffs to gather information about Defendants' conduct and its impact upon consumers; obtained, reviewed, and analyzed BB&T mortgages, LPI policies, and the LPI notices sent to borrowers, and other discovery. (*Id*.)

### 7. The Reaction of the Class to the Settlement.

To date, there are no objections and only four valid opt-out requests, which supports the fee request. *See Pinto*, 513 F. Supp. 2d at 1343; (Haan Decl. ¶¶ 13, 14.)

### B. A Service Award of $5,000 Is Appropriate.

The Court should approve a service award of $5,000 for the Representative Plaintiffs. The detailed notice advised class members that the Representative Plaintiffs would apply for a service award of $5,000 each, and, to date, no class member has objected to this reasonable request. *See Saccoccio*, 297 F.R.D. at 695 (granting $5,000 service award). In instituting this litigation, the Representative Plaintiffs have acted as private attorney generals seeking a remedy for what appeared to be a public wrong. *See Pinto*, 513 F. Supp. 2d at 1344. The Class Representatives aided in the investigation of these claims and settlement. (Joint Decl. ¶¶ 65-66.) Private class action suits are a primary weapon in the enforcement of laws designed for the protection of the public. *See Pinto*, 513 F. Supp. 2d at 1344. Approval of this award is warranted as a matter of policy and is appropriate under applicable precedents.

### <u>CONCLUSION</u>

Plaintiffs and Class Counsel respectfully request the Court grant final approval of the

settlement, as well as the applications for Class Counsel's fees and expenses and class representative service awards.

Respectfully submitted this 22nd day of November, 2016.

By: /s/ Adam M. Moskowitz

| | |
|---|---|
| Adam M. Moskowitz, Esq.<br>Florida Bar No. 984280<br>amm@kttlaw.com<br>Thomas A. Tucker Ronzetti, Esq.<br>Florida Bar No. 965723<br>tr@kttlaw.com<br>Rachel Sullivan, Esq.<br>Florida Bar No. 815640<br>rs@kttlaw.com<br>Robert J. Neary, Esq.<br>Florida Bar No. 81712<br>rn@kttlaw.com<br>**KOZYAK TROPIN &**<br>**THROCKMORTON LLP**<br>2525 Ponce de Leon Blvd., 9th Floor<br>Coral Gables, FL 33134<br>Telephone:  (305) 372-1800<br>Facsimile:   (305) 372-3508<br>*Settlement Class Counsel* | Lance A. Harke, Esq.<br>Florida Bar No. 863599<br>lharke@harkeclasby.com<br>Sarah Engel, Esq.<br>Florida Bar No. 991030<br>sengel@harkeclasby.com<br>Howard M. Bushman, Esq.<br>Florida Bar No. 0364230<br>hbushman@harkeclasby.com<br>**HARKE CLASBY & BUSHMAN LLP**<br>9699 NE Second Avenue<br>Miami Shores, Florida 33138<br>Telephone:      (305) 536-8220<br>Facsimile:      (305) 536-8229<br>*Settlement Class Counsel* |
| Aaron S. Podhurst, Esq.<br>Florida Bar No. 63606<br>apodhurst@podhurst.com<br>Peter Prieto, Esq.<br>Florida Bar No. 501492<br>pprieto@podhurst.com<br>John Gravante, III, Esq.<br>Florida Bar No. 617113<br>jgravante@podhurst.com<br>Matthew Weinshall<br>Florida Bar No. 84783<br>mweinshall@podhurst.com<br>**PODHURST ORSECK, P.A.**<br>City National Bank Building<br>25 West Flagler Street, Suite 800<br>Miami, Florida 33130<br>Telephone: 305-358-2800<br>Facsimile: 305-358-2382<br>*Settlement Class Counsel* | |

10B1026

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that a true copy of the foregoing was filed electronically via CM/ECF on the 22nd day of November, 2016 and served by the same means on all counsel of record.

By:  /s/ Adam M. Moskowitz

21

10B1026